**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SHERRY LOFTIS** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15 C 10453 |
| | ) | |
| v. | ) | |
| | ) | |
| **NANCY BERRYHILL**, Acting | ) | Magistrate Judge Daniel G. Martin |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sherry Loftis ("Plaintiff" or "Loftis") seeks judicial review of a final decision of Defendant Nancy Berryhill, the Acting Commissioner of Social Security ("Commissioner").  The Commissioner denied Plaintiff's application for disability benefits and supplemental security income benefits under Title II and Title XVI of the Social Security Act in a September 15, 2014 written decision of an Administrative Law Judge ("ALJ").  The ALJ issued her ruling after the parties voluntarily remanded an earlier unfavorable ruling issued on June 16, 2011 by a different ALJ.  Loftis appealed the new ruling to this Court and filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision.

## I.  LEGAL STANDARD

### A.  The Social Security Administration Standard

In order to qualify for DIB, a claimant must demonstrate that he is disabled.  An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not

disabled if he can do work that is available under this standard. 20 C.F.R. §
404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final
decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §
405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any
fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).
Substantial evidence is "such evidence as a reasonable mind might accept as adequate
to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court
reviews the entire record, but it does not displace the ALJ's judgment by reweighing the
facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408,
413 (7th Cir. 2008).

Instead, the court looks at whether the ALJ articulated an "accurate and logical
bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir.
2008). This requirement is designed to allow a reviewing court to "assess the validity of the
agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v.
Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ
as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is
adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413
(citation omitted).

## II. BACKGROUND

The Court omits a detailed discussion of the facts on which Plaintiff bases her
disability claim. Loftis claims that she suffers from severe back and cervical pain that was

frequently treated with narcotic pain medications. Various MRI and x-ray studies revealed scattered degenerative disc disease, mild central canal narrowing and stenosis, and abnormalities in the cervical spine. Loftis also complained that she was depressed. Although she had never sought specialized psychological treatment, Loftis was treated by her primary care physician and other non-specialists with various psychotropic medications.

Following the familiar five-step analytic procedure that governs adult disability cases, the ALJ concluded at step one that Loftis had not engaged in substantial gainful activity since her application date of April 17, 2008. Plaintiff's severe impairments at step two were obesity, degenerative disc disease, hypertension, status post retinal vein occlusion of the right eye with laser treatment, and scleritis of the left eye. Though she devoted significant portions of the decision to Plaintiff's depression, the ALJ found that Loftis did not suffer from a severe mood disorder.[1] As part of that analysis, the ALJ applied the "special technique" set out in the regulations for assessing the severity of a claimant's mental impairment. The ALJ concluded that Loftis had a mild limitation in her ability to carry out

_____

[1] That is a surprising conclusion given the astonishing number of psychiatric reports and opinions that exist, some of which directly contradict the ALJ's finding. As the Seventh Circuit has stated, a claimant who does not have a severe mental impairment at step two despite a diagnosis of major depression (as Dr. Nemeth made in this case) "strikes us as nonsensical given that the diagnosis, by definition, reflects a practitioner's assessment that the patient suffers from clinically significant distress or impairment in social, occupational, or other important areas of functioning." *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) (internal quotes and citation omitted).

Nevertheless, any error that an ALJ commits at step two is harmless as long as she goes on to consider the combined impact of a claimant's severe and non-severe impairments. *See Curvin v. Colvin*, 778 F.3d 645, 649 (7th Cir. 2015). The ALJ did so in this case. Given that remand is already required, and in light of the ALJ's numerous errors in evaluating the expert reports, she will have an opportunity on remand to reconsider her finding on this issue at step two.

activities of daily living ("ADLs"), a mild restriction in social functioning, and a moderate limitation in her capacity for maintaining concentration, persistence, and pace. No episodes of decompensation were present.

None of these impairments met or equaled a listed impairment at step three. Before moving to step four, the ALJ evaluated the severity of Plaintiff's symptoms by considering the credibility of her testimony. She found that Loftis' testimony was "not entirely credible." (R. 503). The ALJ then assessed a residual functional capacity ("RFC") of sedentary work as follows:

> She can occasionally, [sic] balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds. She can tolerate occasional exposure to and work around extreme cold and heat, wetness, humidity, vibration, and hazards such as moving machinery or unprotected heights. She needs to change position hourly while at workstation for up to five minutes. She can perform unskilled work tasks that can be learned by demonstration or in 30 days or less of a simple, repetitive and routine nature with occasional contact with the general public of an incidental and superficial nature and occasional interaction with supervisors and co-workers.

(R. 501). As part of this evaluation, the ALJ assigned weights to the opinions of a variety of medical experts, including testifying psychologist Dr. Ellen Rozenfeld and testifying medical expert Dr. Sai Nimmagadda. Plaintiff had no past relevant work at step four. Based on the testimony of a vocational expert ("VE"), the ALJ found that jobs existed in the national economy that Loftis could perform. She therefore concluded that Loftis was not disabled.

### III. DISCUSSION

Loftis argues that the ALJ erred by incorrectly (1) assessing her mental and physical RFC and (2) evaluating her credibility. Part of the ALJ's analysis of the first issue involves

her assessment of the various expert reports. Because the Court finds that remand is required on Plaintiff's first ground, it only briefly addresses the credibility issue.

### A.    The Physical RFC

Plaintiff argues that substantial evidence does not support the ALJ's RFC finding that she "needs to change position hourly while at workstation for up to five minutes." (R. 501). The Court agrees. Testifying expert Dr. Sai Nimmagadda stated that Loftis would need to alternate between sitting and standing for five minutes every 30 to 60 minutes. The ALJ recognized the expert's opinion, which he gave great weight to, and cited it as support for the physical RFC. That RFC, however, only permits Loftis to alternate position every 60 minutes, making it more restrictive than what Dr. Nimmagadda said it should be.

The fact that the ALJ reached a different RFC conclusion than the one given by Dr. Nimmagadda is not erroneous in itself because the RFC is an administrative finding of fact that is within the authority of the ALJ to make. *See Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). When the ALJ does so, however, he must explain the basis of his reasoning and support it with evidence from the record. The ALJ in this case made no effort to do so and therefore failed to build any bridge between the record and this aspect of the RFC. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (stating that "this omission in itself is sufficient to warrant reversal of the ALJ's decision"). *See also* SSR 96-8p ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion[.]"). If Plaintiff actually needs to change her position every 30 minutes, it is difficult to understand how she could work if she were only permitted to do so every 60 minutes. Without any explanation by the ALJ, the Court has no clear idea whether she disagreed with Dr. Nimmagadda on this point, mistakenly

6

accounted for what he said, or whether the jobs that the VE identified would permit Loftis to work even if she needed to take breaks every 30 minutes.[2]

In addition to this oversight, the ALJ also failed to adequately explain why she found that Loftis had an unlimited ability to push and pull. The record contains conflicting expert opinions on this topic. Dr. Nimmagadda testified that Loftis could push and pull without any limitations, and the ALJ cited that finding to justify the RFC. (R. 542). But Dr. Kimberly Middleton, who examined Plaintiff for the Social Security Administration ("SSA"), reached a different conclusion; she stated that Loftis would not be able to perform work that required "repetitive lifting, pulling or pushing." (R. 952). The ALJ was obligated to resolve the conflict between these two expert opinions. *See Bailey v. Barnhart*, 473 F. Supp.2d 842, 849 (N.D. Ill. 2006) ("Moreover, when the record contains conflicting medical evidence, the ALJ has an affirmative responsibility to resolve that conflict.") (citing *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

---

[2] The Commissioner and Plaintiff argue over whether the ALJ's oversight of Dr. Nimmagadda's full testimony constitutes something more than harmless error. The VE testified that an individual could be off task up to six minutes each hour and still engage in competitive employment. Plaintiff claims that if she has to change positions twice an hour for five minutes each, then she would be off task for 10 minutes every hour. The Commissioner claims that, even if Plaintiff changed positions twice an hour, she would still fall within the off-task parameters permitted by the ALJ. Neither position, however, is based on the evidence of record. The Commissioner assumes that, even if Plaintiff needed to change positions twice each hour, she would be off task for five minutes. That assumes that Loftis would be on task for one of these periods but off task for the other. The Commissioner has not cited any evidence for that surprising conclusion. For her part, Plaintiff would be correct if she could show that she would be off-task during the five-minutes permitted for a change in position. But both Dr. Nimmagadda and the ALJ stated that she would remain at her workstation during position changes, thereby implying that she could remain on task throughout the five-minute period allowed for a change of position. After all, the five minutes involves a change in position, not a break from work. If that is not the case, then the ALJ will be able to clarify the matter on remand.

The ALJ never addressed this issue directly, though she differentiated between the two experts by giving great weight to Dr. Nimmagadda's opinion and less weight to Dr. Middleton's. In support, the ALJ cited two grounds, neither of which provides substantial evidence for her finding. The ALJ first stated that Dr. Nimmagadda was familiar with Social Security law. That is a common assertion in disability analyses that can be relevant when an expert's findings depend on the guidelines set out in the regulations that govern disability claims. But that is not the case here. An examining physician does not need to know anything about disability law in order to determine the degree to which a patient can use her arms to push and pull. If the ALJ thought that the regulations should have alerted Dr. Middleton to some other aspect of Loftis' functioning during her exam, then the ALJ should have explained more carefully what it was about Dr. Nimmagadda's knowledge of the SSA regulations that made his opinion more reliable.

Second, the ALJ claimed that Dr. Nimmagadda was more credible because he had reviewed the entire record, whereas Dr. Middleton had only examined Plaintiff on one occasion. That is a non-starter on two fronts. The ALJ never said what it was in the record that was relevant to Plaintiff's ability to push and pull. Thus, the fact that Dr. Nimmagadda was familiar with the record fails to explain why his opinion was more informed than Dr. Middleton's. More importantly, stating that Dr. Middleton was less credible than Dr. Nimmagadda *because* she had only examined Loftis once is nonsensical under these facts: Dr. Nimmagadda never examined Plaintiff at all. In fact, Dr. Nimmagadda did not even observe Loftis since he appeared at the hearing by phone. The regulations instruct ALJs that they are ordinarily required to "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not." 20 C.F.R. §

8

404.1527(d)(1). *See also Criner v. Barnhart*, 208 F. Supp.2d 937, 954 (N.D. Ill. 2002) ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.") (internal quote and citation omitted).

An ALJ does not always have to favor an examining source over a non-examining expert. However, the ALJ must explain the basis of her reasoning with basic clarity. *See Bailey*, 473 F. Supp.2d at 849 ("[W]hile it is the ALJ's responsibility to resolve conflicting medical evidence, her method of doing so must be reasonable and adequately explained."). Given that the ALJ provided no reason to question the adequacy of Dr. Middleton's examination, she did not do so here. In addition, the ALJ herself noted in other parts of her decision that Plaintiff's treating physician Dr. Leazzo concluded that Loftis had a 50 percent reduction in her ability to push and pull. (R. 505). That supports Dr. Middleton's finding and provides additional evidence that contradicts Dr. Nimmagadda's. Yet the ALJ never explained why two examining physicians were less credible than the non-examining expert. Remand is therefore necessary so that the ALJ can explain the basis of her reasoning with greater clarity.

### B.  The Mental RFC

As noted above, the ALJ included several RFC restrictions concerning Plaintiff's ability to concentrate and carry out her work duties: "She can perform unskilled work tasks that can be learned by demonstration or in 30 days or less of a simple, repetitive and routine nature with occasional contact with the general public of an incidental and superficial nature and occasional interactions with supervisors and co-workers." (R. 501).

Plaintiff argues that substantial evidence does not support the ALJ's finding or

9

explain how the ALJ assessed the mental RFC. The Court agrees that the basis of the ALJ's reasoning is almost entirely obscure. An ALJ is always obligated to address how she reached an RFC assessment by discussing in at least minimal form the reasoning that lies behind the RFC and the evidence that supports it. The ALJ's duty in this regard is not optional. Social Security Ruling 96-8p stresses that "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p.

The ALJ not only did not follow that directive, she did not allude to basic aspects of the mental RFC. Nothing in the ALJ's decision, for example, mentions why Loftis might need to learn by demonstration or in 30 days. Nor did the ALJ ever refer to Plaintiff's need for limited contact with supervisors or the general public. The result is a confusing set of inferences and conclusions that this Court will not try to fully untangle. The Commissioner claims that the ALJ's RFC assessment tracked Dr. Nimmagadda's and Dr. Rozenfeld's testimony "nearly verbatim." (Doc. 16 at 6). That is obviously incorrect as it concerns the mental RFC. Dr. Nimmagadda did not say anything on the topic, so there was nothing for the ALJ to rely on to create the RFC. Like other experts, Dr. Nimmagadda thought that Plaintiff's physical and mental impairments were inextricably intertwined. But he never expressed any opinion on what that meant for Loftis' ability to concentrate or interact with others.

As for Dr. Rozenfeld, the Commissioner overlooks that she never articulated a detailed mental RFC, other than to state that earlier evaluators had found that Plaintiff would have difficulties in handling complex tasks and to agree with the ALJ that Loftis could

perform simple and routine tasks. (R. 551). Dr. Rozenfeld thought that any problems that Loftis might experience in concentration stemmed from pain, not depression; she therefore did not state the degree to which Plaintiff could maintain concentration, persistence, and pace. It is true that Dr. Rozenfeld told the ALJ that Loftis had mild limitations in her activities of daily living ("ADLs"), social functioning, and ability to maintain concentration. These conclusions, however, do not constitute a mental RFC assessment. As SSR 96-8p explains, findings concerning a claimant's limitations in the functional areas of ADLs, social functioning, and concentration are not the same as an RFC; an ALJ is required to provide "a more detailed assessment by itemizing various functions contained in the broad categories" that Dr. Rozenfeld addressed. SSR 96-8; *see also Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) (explaining that an ALJ cannot merely lift her findings from these functional areas and include them in the RFC without explaining her reasoning). Not only did the ALJ not do so here, she does not appear to have agreed with all of Dr. Rozenfeld's findings: Dr. Rozenfeld said that Plaintiff's restriction in concentration was mild; the ALJ reached the different decision that it was both mild *and* moderate. (R. 497-98, 551). The ALJ's finding is either self-contradictory or misstates what the ALJ actually thought. In either case, it fails to assert a rational conclusion.

The ALJ could not have relied on the medical record to formulate the mental RFC because, as the ALJ correctly noted, very little evidence concerning Loftis' depression existed. That leaves the numerous psychological experts who issued reports in this case. These included testifying psychologist Dr. Rozenfeld; examining psychiatrists Dr. John Brauer and Dr. Joseph Nemeth; the state-agency expert Dr. Russell Taylor; and Plaintiff's treating physician Dr. Leazzo, who issued a psychiatric evaluation for Plaintiff. The ALJ

11

assigned various weights to some of these experts: great weight was given to Dr. Rozenfeld; "less weight" to Dr. Nemeth; some weight to Dr. Taylor; and little weight to Dr. Leazzo. The ALJ failed to assign a specific weight to Dr. Brauer. *See* 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").

None of the ALJ's discussions of these expert opinions explain how she formulated the mental RFC. Merely restating what the experts concluded was insufficient because "summarizing a medical history is not the same thing as analyzing it, in order to build a logical bridge from evidence to conclusion." *Chuk v. Colvin*, 2015 WL 6687557, at *8 (N.D. Ill. Oct. 30, 3015). Moreover, no single medical expert identified all of the restrictions that the ALJ included in the mental RFC. Many of the ALJ's restrictions, such as the need for instruction by demonstration, were never mentioned by any of experts. That leaves it unexplained how the ALJ went about cobbling bits and pieces of the reports, the record, or whatever else she relied on, to reach the RFC. That requires remand. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) ("[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law required the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.").

That said, the Court declines to leave the issue on that limited ground. The ALJ's assessment of these expert psychological reports raises numerous concerns that require a more careful analysis. The Court therefore briefly addresses several key assessments that the ALJ made so that she can clarify her reasoning with greater care on remand. The regulations lay out six criteria for assessing medical opinions, including the nature and

frequency of treatment, the physician's area of expertise, and the supportability of the record. 20 C.F.R. § 404.1527. Courts in this District have been clear that an ALJ must "consider *all* of the [regulatory] factors in weighing *any* medical opinion." *Wallace v. Colvin*, 193 F. Supp.3d 939, 946 (N.D. Ill. 2016) (internal quotes and citation omitted); *see also Edge v. Berryhill*, 2017 WL 680365, at *4 (N.D. Ill. Feb. 21, 2017) ("An ALJ is not only required to evaluate every medical opinion in the record . . . but he must do so by applying the checklist of six factors set forth in [the regulations]."); *Hall v. Colvin*, 2016 WL 7235785, at *7 (N.D. Ill. Dec. 13, 2016). The ALJ applied one or two of these factors to some of the expert reports but never accounted for all the criteria in relation to any of them. The results are as follows.

### (1)   Dr. Rozenfeld

The most important of the ALJ's evaluations concerned Dr. Rozenfeld. The ALJ appears to have relied (or thought that she relied) on Dr. Rozenfeld's testimony for the mental RFC despite the fact that Dr. Rozenfeld never testified to anything like the ALJ's RFC. Nevertheless, the ALJ gave great weight to Dr. Rozenfeld and cited two reasons for that assessment. First, the ALJ stated that Dr. Rozenfeld had "experience" with Social Security law. (R. 500). The problems associated with relying on boilerplate statements that an expert is familiar with the SSA regulations are discussed above. In this instance, the ALJ may have meant that Dr. Rozenfeld's experience in disability cases gave her expertise in assessing matters like Loftis' restrictions in ADLs, social functioning, and maintaining concentration. The Court agrees with that reasoning insofar as it goes. As noted earlier, however, a claimant's limitations in these functional areas are not the same thing as a mental RFC; an ALJ is required to explain what RFC is required in light of such findings,

13

not merely cite a litany of "mild" or "moderate" restrictions. *See* SSR 96-8p. Testifying experts frequently do that for an ALJ by opining on what the claimant can and cannot do on a continuous basis. But Dr. Rozenfeld did not. Thus, even if the ALJ correctly assigned great weight to Dr. Rozenfeld's testimony, it fails to explain how the ALJ went about formulating the mental RFC.

Second, the ALJ stated that the record supported Dr. Rozenfeld's testimony and that she was familiar with it. In reality, Dr. Rozenfeld appears not to have considered some parts of the record with much care at all. She stated, for instance, that Plaintiff was not as limited as she claimed because Plaintiff had only been treated for depression with the medication amitryptyline (Elavil) and that no changes had ever been made to her antidepressant medication. (R. 548). That is incorrect. Plaintiff's primary physician Dr. Leazzo treated her for depression with the medications Effexor and Zoloft. (R. 459, 461). He even issued an expert report that listed Effexor and provided a far less optimistic view of Plaintiff's mental functioning than the one that Dr. Rozenfeld described. (R. 307-13). Dr. Rozenfeld overlooked Plaintiff's full medication history and Dr. Leazzo's report, strongly suggesting that she was not as familiar with the entire record as the ALJ said.

Equally important, Dr. Rozenfeld misinterpreted other parts of the record that she cited. Plaintiff underwent two psychiatric consultations at the request of the SSA with Dr. Nemeth in January 2010 and with Dr. Brauer in August 2013. Dr. Rozenfeld cited both expert reports for the proposition that any difficulties that Plaintiff experienced in maintaining concentration stemmed from her relatively poor educational background instead of depression. (R. 550-51, "So they seemed to feel there was an impoverished education."). The record suggests otherwise. It is true that Dr. Brauer expressed some

14

concerns on the topic. (R. 945-48). Dr. Nemeth, however, never suggested what Dr. Rozenfeld attributed to him. Indeed, he did not even mention Plaintiff's educational background, other than to note that she attended elementary school in Chicago. (R. 345). Instead of relying on Plaintiff's background, Dr. Nemeth emphasized that she was "very depressed," cried throughout the interview, admitted to suicidal ideations, and diagnosed Plaintiff with a "major depressive disorder, severe." (R. 346). That sounds far more like a condition based on severe depression than one related to a deficient educational background. After reading it with care, the Court finds that Dr. Rozenfeld's interpretation of Dr. Nemeth's opinion is unreasonable on its face. The ALJ should have recognized that Dr. Rozenfeld's account of Dr. Nemeth's report was incorrect and that a conflict existed between Dr. Nemeth and Dr. Brauer on this topic.

### (2) Dr. Nemeth

Dr. Nemeth issued his expert report on January 17, 2010. As noted, it found that Plaintiff suffered from a more serious mental impairment than the ALJ assessed and concluded that Plaintiff was not capable of handling her own finances. (R. 346). The ALJ gave Dr. Nemeth less weight than she assigned to Dr. Rozenfeld for two reasons. First, the ALJ stated that Dr. Nemeth's report was entitled to less weight because "it is based solely on a one-time evaluation." (R. 499). That was insufficient for the reasons discussed earlier concerning Dr. Middleton. Dr. Nemeth's one-time consultation with Plaintiff made him more familiar with her actual mental condition than Dr. Rozenfeld was.

Second, the ALJ thought that Dr. Nemeth's findings were improperly based on Plaintiff's "subjective complaints." (R. 499). The ALJ did not explain what she intended by that finding, but she presumably meant that Dr. Nemeth interviewed Plaintiff without

15

administering objective psychological tests that would have made his report more reliable. The Court rejects the ALJ's perfunctory reasoning on this issue – which is cited in disability cases with distressing frequency – on several grounds. A mental status exam is ordinarily based on an interpersonal interview between an expert and a patient who explains her symptoms and life history. This Court has received hundreds of similar psychiatric reports from SSA-ordered consultations that involve nothing more than the standard interview protocol used by Dr. Nemeth. In fact, Dr. Brauer's August 2013 report in this case is based on the same type of "subjective" interview that Dr. Nemeth used, but the ALJ did not criticize his report (which was less favorable to Plaintiff) on that ground. It is a troubling paradox for the Commissioner to spend taxpayer money for psychiatric exams like those in this case, only to spend more funds criticizing them at a later point on grounds that the government should reasonably have known beforehand might well be utilized.

The Court recognizes that ALJs may question reports that uncritically mirror a claimant's subjective complaints. The regulations also state that a report that is supported by objective tests and laboratory findings may be more reliable than those that are not. 20 C.F.R. § 404.1527(c)(3). But that requirement more easily applies to physical symptoms that readily lend themselves to objective tests or laboratory findings. The Court does not suggest that psychological testing is not important or even necessary when certain topics are at issue. Nevertheless, the regulations themselves reject the position that objective tests are *per se* requirements for evaluating mental impairments. The listings state that mental conditions are evaluated by medical evidence that includes a claimant's "symptoms." 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 12.00B. Symptoms are defined as "your own description of your physical or medical impairment(s)." *Id.* An objective test is

not automatically required to evaluate such descriptions because they are subjective by definition. Moreover, many courts have rejected the position that "objective" tests are always necessary when considering mental impairments:

> The accepted clinical technique for diagnosing a mental impairment is to assess the existence and severity of symptoms and signs identified by the American Psychiatric Association in the Diagnostic and Statistical Manual of Mental Disorders. . . . *This assessment is usually based on a patient's subjective reports and the [psychiatrist's] own observations.* The regulations specify that a psychiatric opinion may rest either on observed signs and symptoms or on psychological tests.

*Huskey v. Astrue*, 2007 WL 2042504, at *6 (D. Kan. July 5, 2007) (internal quotes and citation omitted) (emphasis added). *See also Schwarz v. Barnhart*, 70 Fed.Appx. 512, 518 (10th Cir. 2003) (rejecting a strict need for objective testing); *Garcia v. Comm. of Soc. Sec.*, 496 F. Supp.2d 235, 242 (E.D.N.Y. 2007); *Browning v. Astrue*, 2010 WL 3730172, at *13 (D.S.C. July 30, 2010).

The ALJ should have explained the basis of her reasoning with greater care if she thought that this case demanded something more than the accepted techniques that Dr. Nemeth used. For these reasons, the ALJ is directed to reconsider the weight to be given to Dr. Nemeth's report. If she continues to believe that Dr. Nemeth's mental status exam was deficient because it lacked objective tests, then she is directed to account for that fact in her analysis of Dr. Brauer's report.

### (3) Dr. Leazzo

Loftis' treating physician Dr. Leazzo issued a report on March 22, 2010 concerning Plaintiff's physical and mental functioning. Dr. Leazzo noted that Loftis suffered from severe back pain that "has caused moderately severe depression." (R. 309). He noted that she would experience difficulties in concentrating, completing tasks on time, and multi-

17

tasking. (R. 310). Confusingly, the ALJ gave conflicting assessments of Dr. Leazzo's conclusions. The ALJ initially assigned "little" weight to his findings concerning Plaintiff's concentration and ability to complete tasks because Dr. Leazzo was not a psychological expert. (R. 499). Later in the decision, however, the ALJ gave "some" weight to the same conclusions. She rejected giving greater weight to Dr. Leazzo because his evaluation was based on Plaintiff's subjective complaints, was "sympathetic" to Plaintiff, and was unsupported by the record. (R. 505).

None of the ALJ's reasons constitute substantial evidence for her conclusions. Unlike Dr. Rozenfeld, Dr. Nimmagadda, or Dr. Brauer, Dr. Leazzo was a treating source. Social Security Ruling 96-2p advises ALJs that a treating source is ordinarily entitled to controlling weight. Even when the evidence requires a different conclusion, "[a]djudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means *only* that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." SSR 96-2p (emphasis added). An ALJ is still required to evaluate the expert's opinion in light of the six regulatory factors cited earlier. The ALJ only considered the fact that Dr. Leazzo did not specialize in mental health issues. That is true, but it fails to explain why he was less credible than other non-treating, non-examining sources. Dr. Leazzo recognized that Plaintiff's depression was closely linked to her physical pain – a fact echoed by other experts whose opinions the ALJ accepted. That required the ALJ to consider that, even though he was not a psychiatrist, Dr. Leazzo's understanding of Plaintiff's condition matched the expertise that these other experts brought to the issue. Moreover, Dr. Leazzo's treatment history

made him far more familiar with her condition than any other expert was.

The ALJ's remaining reasons are without merit as they currently stand. The fact that Dr. Leazzo based his opinion on Plaintiff's "subjective" complaints fails to distinguish it from the opinions of other experts. Dr. Brauer also merely listened to what Loftis told him. Dr. Rozenfeld and the state-agency psychologists did not even have that direct information because they never examined Loftis at all. Moreover, the ALJ should have considered that Dr. Leazzo treated Plaintiff for a longer period than any other source, and he prescribed both Zoloft and Effexor for her depression. As noted, both the ALJ and Dr. Rozenfeld overlooked that fact.

Finally, the ALJ cited nothing to support her conclusion that Dr. Leazzo was unduly biased in Loftis' favor. "The ALJ must have a substantial evidentiary basis for finding a bias by the treating physician, and an otherwise medically valid opinion will not be ignored merely because of speculation that the physician was sympathetic to the claimant." *Goyco v. Colvin*, 2014 WL 5152570, at *5 (N.D. Ill. Oct. 14 2014) (citing *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009)) (internal quotes omitted). *See also Books v. Chater*, 81 F.3d 972, 979 (7th Cir. 1996) ("[T]here is no presumption of bias in a treating physician's disability opinion."); *Micus v. Bowen*, 979 F.2d 602, 609 (7th Cir. 1992) ("The ability to consider bias, however, is not synonymous with the ability to blithely reject a treating physician's opinion or to discount that physician's opportunity to have observed the claimant over a long period of time."). The ALJ should have considered that Dr. Leazzo's opinion was supported, at least in part, by Dr. Nemeth's. Without articulating any reason for assuming that Dr. Leazzo was biased in favor of Loftis, the ALJ failed to provide a rational basis for her rejection of his expert opinion.

For these reasons, Plaintiff's motion is granted on the RFC issues.

**C.    Credibility**

Plaintiff claims that the ALJ failed to properly assess the credibility of her statements concerning the seriousness of her symptoms.  The Court does not address this issue in detail, as the case already requires remand.  That said, the ALJ should reconsider the reasons for evaluating Plaintiff's symptoms under SSR 16-3p for the following reasons.

The ALJ criticized Plaintiff for not receiving more complete and aggressive medical care.  However, Loftis told the ALJ that she lacked health insurance.  (R. 36).  The ALJ never accounted for that important fact.  Courts have repeatedly instructed ALJs that they cannot criticize a claimant's medical care as overly conservative without first considering the reasons that might have limited more thorough treatment. *See*, *e.g.*, *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015); *Craft*, 539 F.3d at 679.

Instead of following this well-established standard, the ALJ complained that Loftis' did not have money to seek treatment because she spent money on cigarettes.  That lacks all merit, however, because an ALJ may not rely on a claimant's smoking habits to draw adverse inferences about credibility or the costs associated with smoking. *Eskew v. Astrue*, 462 Fed.Appx. 613, 616 (7th Cir. 2011); *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000). Moreover, Plaintiff stated that she smokes half-a-pack of cigarettes each day.  Common sense makes clear that saving the money that would be spent on 10 cigarettes a day could hardly pay for, say, back surgery.  That point is important because the ALJ complained that Plaintiff had never undergone surgery.  The ALJ suggested that Loftis did not require such intrusive treatment but failed to note that neurosurgeon Dr. George DePhillips recommended spine surgery to treat Loftis' back pain.  (R. 226).  The ALJ also concluded

that Loftis' depression was not as serious as she and several medical experts said it was because she never sought mental health treatment. But Plaintiff told the ALJ at the hearing that she did not have any money to pay a psychiatrist to treat her. (R. 54). The ALJ had no ground for criticizing Plaintiff's account of her condition without first addressing these issues.

Along similar lines, the ALJ criticized Plaintiff for being non-compliant with her medications and for cancelling some of her doctors' appointments. Yet the ALJ never questioned Loftis on this topic. Social Security Ruling 16-3p, which now controls how an ALJ considers a claimant's statements concerning her symptoms, permits adjudicators to consider inconsistencies in a claimant's treatment history and her failure to follow a doctor's recommendations. The Ruling makes clear, however, that an ALJ must still "ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints." SSR 16-3p. The ALJ never addressed this issue at the hearing and did not discuss it in the decision.

Like SSR 96-7p, which addressed the kind of credibility analysis that ALJs no longer make, SSR 16-3p continues to advise adjudicators that they should consider a claimant's ADLs when evaluating the severity of the claimant's symptoms. The ALJ briefly considered the issue and concluded that Loftis' activities indicated that she was not seriously limited because she could garden, shop for groceries and do a "wide range of chores." (R. 503). However, the ALJ failed to consider that Loftis' activities were considerably less strenuous than the ALJ suggested. Plaintiff stated that her garden was no more than four feet by three feet and that she worked intermittently because she could not do so for more than short stints. (R. 530, 540). Loftis' ability to tend such a small space for brief periods of time

hardly supports a finding that she could work on a full-time basis. As for chores, Plaintiff told the ALJ that she does the things that the ALJ cited, but Loftis carries out these minimal household jobs very slowly. It takes two to three hours to dust, and two to three days to do laundry; she requires help in doing laundry, mopping, vacuuming, sweeping, and weeding her garden. (R. 853). The ALJ cited no evidence to contradict these statements. The Seventh Circuit has criticized an ALJ's easy reliance on such minimal activities too frequently to warrant further discussion of the issue. *See*, *e.g.*, *Gentle v. Barnhart*, 430 F.3d 865, 867-88 (7th Cir. 2005). Plaintiff's motion is accordingly granted on this issue.

## IV. <u>CONCLUSION</u>

For these reasons, Plaintiff's motion [19] is granted. The Commissioner's decision is remanded to the SSA under sentence four of 42 U.S.C. § 405(g) for further proceedings. The ALJ is directed to:

1. Explain the basis for the RFC finding that Plaintiff only needs to change positions once every 60 minutes;

2. Resolve the conflict between Dr. Middleton's and Dr. Nimmagadda's opinions concerning Plaintiff's ability to push and pull;

3. Restate the reasons for evaluating the severity of Plaintiff's alleged symptoms;

4. Restate the reasons for the weights assigned to the opinions of Dr. Rozenfeld, Dr. Nemeth, Dr. Brauer, and Dr. Leazzo. In doing so, the ALJ shall apply all of the factors listed in 20 C.F.R. § 404.1527)(c) to each expert opinion; and,

5. Explain with greater clarity the reasoning and evidence that supports the physical and mental RFCs.

ENTERED:

Date: May 26, 2017

DANIEL G. MARTIN
United States Magistrate Judge